(No. 4553-

BETTIE B. BOVEY AND ROBERT W. BOVEY, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed February 25, 1955.*

MOREY C. PIRES, Attorney for Claimant.

LATHAM CASTLE, Attorney General; C. ARTHUR NEBEL, Assistant Attorney General, for Respondent.

WHAM, J.

This is a case involving a claim against respondent, State of Illinois, by claimant, Bettie B. Bovey, in the amount of $7,500.00 for injuries to her person, and hos-

pital and medical expenses incurred thereby, and by claimant, Robert W. Bovey, her husband, in the amount of $2,000.00 for past and future loss of his wife's services.

The claim grew out of a headon collision between the Bovey automobile, driven in a northerly direction by claimant, Bettie B. Bovey, and an automobile driven in a southerly direction by one Lowell Zander. The collision occurred on the 22nd day of November, 1951, on a public bridge, owned and maintained by respondent, known as the Grand Detour Bridge, which spans the Rock River on Illinois State Bond Issue Route No. 2, approximately four miles northeast of Dixon, Illinois, and one half mile south of the Village of Grand Detour, Illinois.

It is claimant's contention that the accident was caused by the dangerous condition of the bridge floor, which fact was known to respondent, and that respondent failed to properly warn members of the traveling public, including claimant, Bettie B. Bovey, of such condition. It is respondent's contention that the accident resulted from contributory negligence on the part of claimant, and, further, that respondent was guilty of no negligence.

The facts of the case, as appearing from the testimony presented by both claimant and respondent, for the most part are uncontradicted, and are as follows:

Grand Detour bridge is approximately 996 feet long and 26 feet wide. It was constructed by the State of Illinois, and opened for public use in 1947. It slopes from south to north, and has a fall of approximately 6 feet. The surface of the bridge, at the time of the construction thereof, as well as the accident involved herein, consists of a steel grid floor assembled in sections. Each section was constructed of parallel steel plates

one-quarter inch thick running lengthwise, and bisected by other steel plates running crosswise. This construction left rectangular openings in the floor of the bridge approximately two and one-half by one and five-eighths inches. The design and method of construction were of sound engineering practice, but there was an error in the fabrication of the sections of the steel grid floor at the manufacturing plant, so that, when the sections were assembled at the site of the bridge, there was a misalignment of the longitudinal plates at a point where one section joined the next section.

The approaches at either end of the bridge were paved with concrete. At the time of the accident, there were no speed limit signs, slow signs, or other signs at or near the bridge. The only sign in the immediate vicinity was a sign, 36 inches square, with black letters 6 inches high, on a yellow background, which stated ''Bridge Slippery When Wet—Frosty''.

It appears from the evidence that the Division of Highways of the State of Illinois was advised by many complaints of members of the traveling public generally that an automobile crossing the bridge was subject to a weaving, side swaying motion by reason of the misaligned sections. In May of 1949, as a result of the complaints, the Division of Highways welded small buttons to the grid surface to prevent the slipperiness, and to eliminate the side swaying motion. It appears from the evidence that the buttons did not accomplish this purpose.

In regard to the extent of the side swaying motion imparted to vehicles, there is a conflict in the testimony. Mr. Merton M. Memler, Assistant District Engineer with the Division of Highways at the time of the acci-

dent, and now District Engineer, stated that he had never felt the swaying sensation himself. Mr. Ralph M. Ferguson, then District Engineer, testified he never experienced difficulty crossing the bridge.

Irrespective of this, however, the matter was discussed by Mr. Ferguson with his superiors in the Springfield office of the Division of Highways, both verbally and in writing, at different times during 1948, at which time it was determined that the buttons, heretofore mentioned, should be installed.

In addition to this, there were several independent witnesses, who testified on behalf of claimants in the instant case, that they themselves had observed the swaying motion; and one witness, a Mr. William Haefliger, testified that he had crossed the bridge many times, and that the weave and sway of the front wheels would be as much as two feet when various sections of the steel matted bridge were crossed. Another witness, Charles Brockwell, who crossed the bridge twice daily, stated that he always noticed the sway, and that on one occasion in September of 1951 his truck had completely reversed directions, because of the misalignment of the sections. Other witnesses, who testified to this same condition, were Mr. Paul Swedberg, and claimant, Bettie B. Bovey.

In addition to the complaints concerning the swaying motion of the bridge, as early as 1948 complaints were being made to the Division of Highways in regard to the slipperiness of the bridge during damp and icy weather. In the spring of 1948, the sign referred to above, which reads, to-wit: "Bridge Slippery When Wet—Frosty", was installed. Subsequent to the installation of the sign, an accident, which occurred on the bridge on Easter day of 1950, at a time when the bridge

was a sheet of ice, and the pavement approaches thereto merely damp, brought to the attention of the Division the tendency of the bridge floor to ice more suddenly than the other bridges and roadways in the area. The Division became advised of this accident from a report submitted by a State Police Officer, Robert Nichols, who reported the facts of the accident, and stated: "The bridge is made of steel mat, is very dangerous when wet or icy." Mr. Ferguson testified that he knew of this accident in 1950, and so advised the office of the Division of Highways in Springfield.

Briefly, the facts of that accident, as testified to by claimant's witness, Melvin Fiscal, are as follows:

On Easter Sunday morning of 1950, Mr. Fiscal in traveling north crossed the bridge, while it was wet, at 15 miles per hour. Although it was wet, there was no ice on the bridge. Later, while driving south at about 9:30 A. M., he started to cross the bridge. There was no ice on the pavement, but the bridge had a coating of ice a quarter of an inch thick. He saw a driver approaching the bridge from the south, and flashed his lights to warn the driver to slow down. When the automobile from the south entered the bridge, it slid sideways half the length of the bridge until it was in his lane. It struck his automobile headon. Almost immediately thereafter, an automobile following Mr. Fiscal collided with the back end of the Fiscal automobile. A few minutes later a transport truck stopped at the south end of the bridge, the driver got out of the truck, walked on the bridge, decided he could go through, but, while driving on the bridge at about 5 miles per hour, and attempting to go around one of the automobiles involved in the accident, the truck failed to respond to his at-

tempts to turn it, and slid straight ahead into the automobile.

The evidence further shows from the testimony of Mr. Ralph Ferguson, then District Engineer, that, since the happening of the Easter, 1950 accident, the Division became concerned over the tendency of the bridge to freeze quickly, and from that time on gave consideration to a solution to cure the sudden freezing quality of the bridge. He stated that the steel surface was subject to a considerably quicker freezing action than a bridge constructed with a concrete or asphalt surface, and that the Division, prior to the Bovey accident, and after the accident of Easter, 1950, had numerous discussions concerning a method of resurfacing the flooring of the bridge.

Over objection of respondent, Mr. Ferguson testified that, approximately one year after the Bovey accident, a solid bituminous surface was installed on the floor of the bridge, and that, since such installation, the safety problem created by the quick freezing propensity of the steel grid surface has been solved. Respondent's objection was based upon the general rule that no change of condition made after the occurrence of the Bovey accident is admissible in evidence to establish an implied admission that respondent was guilty of negligence in causing the injury.

We agree with respondent that such is the law in this state. However, it is also the law that there may be other evidential purposes for which the acts in question may be received in evidence.

In *Jones on Evidence,* Vol. 1, pp. 540-541, it is said:

"According to the general rule, which is to be deduced from the authorities, such evidence is incompetent. The courts recognize, however, a number of ex-

ceptions to the rule, one being in case the evidence is offered to prove conditions existent at the time of the accident, and another where the evidence may become pertinent on the question as to whose duty it was to make repairs."

Although Illinois recognizes the general rule, it likewise recognizes exceptions to the rule. In the case of *Kuhn* vs. *I.C. R.R. Co.*, 111 Ill. App. 323, which case involved an action for damages based upon public nuisance, the court held at page 329, as follows:

"We hold that the evidence offered, to the effect that the smoke-stacks were raised after suit was brought and that the nuisance was thereby largely, if not entirely, abated, though incompetent as an admission of negligence, was competent as tending to show *that the lowness of the stacks caused the damage complained of in the declaration.*"

See also *City of Chicago* vs. *Dalle*, 115 Ill. 386, at 388 and 389.

It appears to us, that this evidence is admissible, since it, considered in the light of all the evidence, tends to establish the existence of the particular hazard involved at the time of the accident, namely, a considerable difference in the freezing quality of the steel grid surface with that of the more common bituminous or concrete surface bridge. This fact, therefore, bears upon the existence of the condition that claimant contends caused the accident, and for that purpose is admissible.

Mr. Ferguson testified that a concrete surface would place too much weight on this particular type of bridge construction, and that the Department did not know how to place a blacktop surface on the bridge, until they became advised of a certain process, which they learned of after the Bovey accident. It further appears from the evidence, however, that this process, known as the Nelson Stud Welding Process, was in existence, although

unknown to the Division. It had been developed by a Chicago firm, and consisted of welding stud bolts to the grid floor, which secured in place a metal mesh, over which a bituminous surface was spread, and is the method, which respondent eventually used.

Mr. Ferguson testified that he had made repeated requests for a solution to the problem created by the surface of the bridge, and, although the Division did not ignore his requests, they seemed to find no solution to the problem.

From the evidence, it is clear to us that the Division, long prior to the Bovey accident, had actual notice of the hazardous condition of the bridge floor, especially the hazard existing during those periods wherein the bridge was icy and slick, although the roadways and other bridges in the area were free from ice.

In spite of that knowledge, the only other precaution taken by respondent was an order, issued by the Division of Highways to Mr. Ferguson, to put flares at the end of the bridge when he found the bridge becoming icy. Mr. Ferguson testified that, by the time word would arrive at his headquarters, the bridge was in such a condition, it would have been icy for some while. This procedure was followed by Mr. Ferguson from the happening of the Easter day accident in 1950.

On the day of the accident in question, claimant, Bettie B. Bovey, a married woman, now 36 years, of age, and the mother of one child, left her home in Grand Detour driving a 1949 green Ford Convertible, which was in good mechanical condition. She drove south across the bridge at about 7:30 A. M. At that time the bridge was dry, and the pavement was free from ice and frost. She proceeded to her mother's home in Dixon, Illinois, four miles south of Grand Detour, and, after

visiting for a short while, started on her return trip to Grand Detour. Mrs. Bovey testified that the temperature, when she left her home in Grand Detour, was rather mild for that time of the year. She stated that she could tell no particular difference in the temperature upon leaving her mother's home, and that the only difference in the weather was that a mist was falling, causing the pavement and the bridge to become damp. Mrs. Bovey testified that the paved road was free from ice, that there was no snow or frost on the countryside, trees and vegetation, and that on her return trip she crossed a bridge with a concrete surface, which was free from ice and not slippery. Mrs. Bovey testified that she was proceeding at approximately 45 miles per hour, and, as she approached the bridge, slowed to a speed of approximately 25 miles per hour. As she entered upon the bridge surface, her car swerved suddenly to the right against the curb of the sidewalk running along the east edge of the bridge, and from that point on her car was completely out of control. It slid along the bridge toward the other end, and she collided with an automobile being driven in a southbound direction. The accident occurred at approximately 9:00 A. M.

Subsequent to the time that Mrs. Bovey crossed the bridge, while proceeding to her mother's home in Dixon, the bridge floor suddenly became frozen. It appears from the evidence that some time prior to 8:30 in the morning the bridge started to ice. Witness, Amos Conley, a service station operator in Grand Detour, whose station was located approximately one-half mile north of the bridge, was called to come to the bridge, and tow a disabled automobile away. Mr. Conley testified that, when he arrived, he found a 1948 Chrysler coupe had slid into the side of the bridge, bending the

bumper against the wheel, requiring it to be straightened. He stated that the bridge floor was icing at that time. Mr. Conley further testified that, prior to being called to the bridge to tow the Chrysler automobile away, a Chevrolet coupe had stopped at his station for slight repairs, and he was informed by the driver that the bridge was icy, and the coupe had slid into the guard rail.

Mr. Conley further testified that, approximately one-half hour prior to the occurrence of the accident in which Mrs. Bovey was injured, Mr. Ralph Ferguson, the District Engineer, stopped by his station, and asked if he, Conley, had heard of any complaints about the bridge that day. Mr. Conley told Mr. Ferguson about the accidents, which had occurred, and further stated that it, the bridge, "didn't look too good". Mr. Ferguson was on his way to church at the time, and did not go to the bridge prior to the happening of the Bovey accident, nor did he take any action with respect to setting out flares.

It appears from respondent's exhibit No. 1, a motor vehicle accident report, that a third accident occurred on the bridge that morning before the Bovey accident. After the Chrysler automobile had been towed in, a Mercury, driven by Carl Marine, proceeding south was sideswiped by a Plymouth automobile going north at approximately 8:45 A. M. The report indicates that this accident occurred while the vehicles were crossing the bridge, which was coated with ice and slippery, and that the northbound vehicle skidded, went out of control, and struck the southbound vehicle. The Plymouth automobile was driven across the bridge, and parked at the north end thereof, whereas the Mercury automobile was

abandoned by the west sidewalk between the center and south end of the bridge.

At the same time that Mrs Bovey approached from the south, a green Oldsmobile sedan, driven by Lowell Zander, was entering the north end of the bridge in its own lane, followed by a Buick automobile, driven by a Mr. Paul Swedberg. When Mr. Swedberg entered the bridge, he did not know it was icy. After entering the bridge, he saw the Bovey car approaching from the south, and sliding out of control toward the Zander automobile. Mr. Swedberg then tried to stop, turned sideways, and slid approximately 150 to 200 feet into the Oldsmobile ahead of him, after it, the Oldsmobile, had already collided headon with the Bovey automobile in the Oldsmobile's traffic lane. After he stopped, Mr. Swedberg got out, and almost fell down on the icy bridge, because of the icy condition. No occupants in the Zander automobile were called as witnesses by either claimants or respondent.

It was in this accident that Mrs. Bovey received the injuries, for which she brings suit. Before discussing the question of damages, we will first address ourselves to the question of liability.

From the evidence in this case, it clearly appears that the steel grid floor of the bridge was unquestionably subject to becoming icy and slick on occasions, when the approaching highway and other bridges in the area did not become icy. It also is clear from the evidence that the flooring in this type of bridge freezes more quickly than the ordinary concrete surface or bituminous surface bridge.

It is also apparent from the record that respondent had knowledge of this condition for more than a year prior to the Bovey accident, recognized the hazard it pre-

sented, and, in fact, the Division of Highways was attempting to arrive at a solution by devising a method to resurface the bridge.

It also appears from the evidence that the manner in which the bridge was constructed was faulty, at least to the extent that it imparted a swaying motion to vehicles proceeding across the bridge, due to defective fabrication of the steel grid sections. This, respondent also was cognizant of, and had attempted to find some solution to correct the situation.

Under these circumstances, even though respondent might not have been negligent in failing to devise a method for surfacing the bridge, which the evidence shows was not known by the Division of Highways until after the Bovey accident, it nevertheless should have recognized, and in our judgment did recognize, the unusual hazard, which the combination of climatic conditions and the bridge surface presented.

It is not unusual for bridges to freeze in snowy, icy, and extremely cold weather, when the pavement is free from ice or snow. This condition occurs, because the ground temperature imparts a warmth to the pavement, while the bridge floor obtains no such warmth. This condition, the traveling public should take cognizance. However, at a time when other bridges in the same area are free from slipperiness, and, when there is no evidence of snow, ice or freezing temperature, then, under such conditions, an icy bridge, such as the one involved in the instant case, presents in our judgment, a hazard not readily foreseeable, and constitutes a trap for members of the traveling public, who are not acquainted with the difference in freezing qualities of the various bridge floors.

Knowing that this situation did exist, and apparently being powerless to correct it without closing the bridge, respondent owed a duty to the traveling public to give sufficient and reasonable warning of this particular danger and hazard, if the bridge was to be continued in use.

The fundamental question involved in this case appears to us to be: Was reasonable warning given of the existence of this particular hazard, which was known by respondent to exist? As stated above, the only warning given was by the sign reading "Bridge Slippery When Wet — Frosty".

In considering this question, it is to be noted that respondent's witness, Mr. Ferguson, then the District Engineer, stated that he had tested the bridge on many occasions, crossing it at 30 to 60 miles an hour in wet weather, and that the bridge was not slippery under those conditions. Therefore, we must assume from the evidence that, had there been no ice on the bridge, it would not have been slick from the mere existence of moisture alone.

There is no evidence in the record of any frost being visible on the bridge, on the countryside, or on the highways, and, in fact, Mrs. Bovey stated there was none. Therefore, the sign served as no warning that the bridge might be icy, when there was no frost, ice or snow visible elsewhere.

It is further to be noted that the Division of Highways had notice of the ineffectiveness of the sign under the circumstances involved herein, by reason of the accident that had happened on Easter day of 1950, heretofore referred to; after which, according to the testimony of Mr. Ferguson, the Division of Highways became quite concerned to the extent that they held many conferences

on the question of this particular hazardous condition; and, although arriving at no solution as far as surfacing the bridge was concerned, determined that, when the bridge became icy, burning flares should be placed at the entrance of the bridge. It is common knowledge that such procedure is not used on regular concrete bridges, and, therefore, this activity on the part of the Division of Highways indicates to us that they themselves were not satisfied with the warning afforded by the signs.

The duty which the state owes to the public in maintaining its highways is well settled. As stated in *Rickelman* vs. *State of Illinois,* 19 C.C.R. 54 at 57:

"Respondent's duty to maintain state highways in a safe condition or to warn of unsafe conditions is manifest."

We have also held that, if the state has knowledge, actual or constructive, of a dangerous condition on its highways, and fails to warn the public of the condition, with resultant injury, it must respond with damages for its negligence. *Pomprowitz* vs. *State of Illinois,* 16 C.C.R. 230; *Rickelman* vs. *State of Illinois,* 19 C.C.R. 54; *Hubbard, Et Al* vs. *State of Illinois,* 21 C.C.R. 495.

It is likewise the law that the state is not an insurer against accidents on its highways, but is required only to keep them in a reasonably safe condition for the purpose to which the portion in question is devoted, and the placing of signs warning of the conditions to be met, fulfills the obligation of the state to the users of the highway. *Gray, Et Al* vs. *State of Illinois,* 21 C.C.R. 521.

What constitutes an exercise of reasonable care in regard to the maintenance of the highways, and the reasonableness of warning signs is, of course, a question of fact to be determined by the Court from all the facts and circumstances in evidence in each given case.

In our legal research, we have found no case squarely on point with the instant case. Several cases involving the absence of signs altogether have been before the Court, but few involving the adequacy of signs have been presented. In one case, *Terracino, Et Al* vs. *State of Illinois,* 21 C.C.R. 177, the Court denied claimants' claim. The facts disclosed that an accident occurred by reason of claimants' automobile striking a hole in the pavement, throwing the driver out of control, and into a headon collision with an approaching automobile. The evidence, however, in that case disclosed large signs bearing the legend ''Pavement Patching Ahead. This road is being kept open for your convenience. Drive With Caution. Barricade and one way traffic ahead.'' A further sign was erected, which bore the legend ''Speed Limit 25 M.P.H. in repair zones''. The evidence further reflected yet another sign reading ''U. S. 66—7 miles, under construction, patching, widening, and resurfacing. This road is being kept open for your convenience. Drive With Caution.'' The evidence reflected still other signs of warning. The Court, in denying the claim, recognized the general rules of law referred to above, namely, that the state would be negligent if, having knowledge of dangerous conditions on the highway, it failed to warn users of the highway of such dangerous conditions, but found at page 182:

"However, the record in this case discloses that the state had fulfilled its obligation to users of the highways by the erection of *large, unambiguous and prominent signs that adequately warned of the conditions* users would encounter in the construction area."

In *Pomprowitz* vs. *State of Illinois,* 16 C.C.R. 230, this Court allowed a recovery wherein the facts indicated that respondent had failed to properly warn the traveling public of an excavation in the highway. The facts

of that case established that the state had placed a barricade and flares before the excavation, but that the flares had either not been lit, or had gone out prior to the accident. The Court at page 235 stated:

"There can be no question that respondent in the construction, maintenance, and repair of its highways has a duty to exercise reasonable care and caution to prevent injury to or destruction of life and property. Where respondent, in the course of road repairs, leaves a deep excavation in the highway it is incumbent upon it to take reasonable measures to guard against injury to the public. Minimum safeguards would be adequate barriers and suitable lights, warning of the hazardous and dangerous situation."

And, at pages 236 and 237:

"The Court is of the opinion that respondent was negligent in the performance of its duty to the traveling public by failing to maintain, during the night of August 21st and the morning of August 22, 1945, proper warning of the existence of this dangerous excavation. Respondent cannot meet its obligation to motorists traveling on a busy, four lane highway, in these days of almost continuous commercial and personal motor travel, by putting up a single barrier, lighting two or three flares in late afternoon, and returning the following morning with a hope and a prayer that all is well."

In *Rommel* vs. *State of Illinois*, 20 C.C.R. 220, the Court allowed a recovery for injuries occurring because of an excavation in the highway, and from respondent's negligence in failing to light and warn motorists of the presence of barricades. In that case there was testimony that there was no flare illuminating the sign along the highway and shoulder, 550 feet west of the crest of the hill, which was black and yellow, and bore the legend "Road Repairs Ahead". In *Cruger* vs. *State of Illinois*, 20 C.C.R. 138, the Court allowed a recovery on much the same set of facts.

In the instant case, as far as the signs are concerned, we are confronted with the situation where there was a sign clearly visible, and known to claimant. Our attention is, therefore, addressed to the question whether, under all of the facts and circumstances, the sign was

such that gave reasonable notice and warning of the particular hazard involved.

It is the contention of respondent that there is no liability upon the state for injuries resulting from slipperiness of streets and sidewalks due to the presence of ice or snow, which has accumulated as a result of natural causes, citing the case of *Ritgers* vs. *City of Gillespie,* 350 Ill. App. 485. At page 491, the court in that case set forth the general rule in Illinois:

"The authorities in Illinois generally agree that the city is not liable for injuries resulting from the general slipperiness of streets and sidewalks due to the presence of ice and snow, which have accumulated as a result of natural causes."

And, at page 492:

"The basis of this rule of law is that it is unreasonable and impractical to compel a city in our climate to perform the labor necessary to remove ice and snow from its streets and sidewalks to keep them safe for travel. If the accumulation is caused by some defect of the street or sidewalk, and this creates the dangerous condition, then a city may be liable. (*Graham* vs. *City of Chicago,* 346 Ill. 638.)"

We agree that such is the rule in Illinois, and, if this case involved simply an accident on an ordinary bridge or highway, because of generally icy conditions, there could be no recovery.

To decide this case on that question, however, would be a great over simplification of the questions involved herein. It was not just the mere existence of ice, which brought about the accident in question, but it was primarily due to the nature of the bridge being subject to a quick freeze at a time when there was no evidence of ice, snow, or extremely cold weather in the general area surrounding the bridge, and even other bridges in the same area were not slippery, thus creating a trap for the unwary traveler.

This question involving a trap created by unexpected icy areas has been involved in a few cases in the United States, one of which is the case of *Taylor* vs. *City of Albany*, 239 App. Div. 217, affirmed by the New York Supreme Court in 264 N. Y. 539, 191 N.E. 554, and abstracted in *9 Negligence and Compensation Cases, Annotated, New Series*, at page 633. It was a suit for personal injury brought by a motorist against the City of Albany and a railroad to recover for personal injuries sustained when her car skidded on an icy pavement and collided with a supporting column, as she drove under a railroad bridge in the City of Albany. It appeared that, at the time the roadway was built under the bridge, it was necessary to level the highway for a distance of 1,000 feet. No drainage was provided either by the City or the railroad, with the result that water would flow under the bridge from the higher portions of the highway and the railroad embankment, and in cold weather it would freeze forming ice several inches thick. On the day in question, *the pavement on either side of the bridge was dry, but underneath the bridge the road was covered with ice.* The court in reinstating the verdict, which had been rendered by the jury in favor of the plaintiff, stated at page 634:

"'The defendant railroad company built and maintained the bridge. The city approved the construction by allowing it to be maintained for many years, and fixed the level of the pavement below the adjacent surface. Each knew that no drainage was provided to remove the water, which gathered in this hollow, that it was held upon the pavement by the footings of the adjacent colonnades, and that in freezing weather ice would be formed, which being shaded by the bridge would melt more slowly than on other portions of the pavement. For this reason, each recurring thaw, followed by a freeze, would thicken the blanket of ice until the roadway was raised so that the water drained to the sides. The city, jointly with the railroad company, created this dangerous condition, and is presumed to know of its own negligent act. Written notice was unnecessary. . . . The city . . . failed in its duty to use the care requisite to maintain the street in a reasonably

safe condition for travel. The railroad company failed to maintain its structures over the highway so that water would not drain and leak upon the pavement, creating a dangerous and unsafe condition.' "

This case, although not clearly in point, is similar in that respondent in the instant case had selected the particular floor involved, and knew of its propensity toward freezing, when the surrounding area was not frozen.

Another similar situation is presented in the case of *Khoury* vs. *Saratoga County, Carma* vs. *Saratoga County* (two cases), 267 N. Y. 384, 196 N.E. 299, 17 N.C.C.A. (N.S.) 507, which cases were decided in 1935. The action was for wrongful death and personal injuries resulting when the persons involved were struck by an automobile, which skidded on the icy roadway of a bridge, striking the pedestrians, and then traversing the walkway of the bridge. The bridge in that case was a county line bridge over a waterfall. The facts established that the ice was formed from spray dashing up from the falls below, and that "the dangerous character of the place was due not simply to the ice, but because the ice was on the bridge only, all of the rest of the highway and approaches being dry. Consequently, one ran onto the ice without previous warning or notice." In that case, the facts established that there were no warning signals, nor had there been any sand placed on the floor of the bridge. It was further established that the county had known of this danger for a long time. It appeared from the decision in the case that the court treated it as one of public nuisance rather than negligence.

A similar case, *McCracken* vs. *Curwensville Borough,* 309 Pa. 98, 163 A. 217, 86 A.L.R. 1379 (1932), involved a suit to recover for the death of plaintiff's husband, who, while driving his automobile, skidded on

the icy approach to a bridge, and went through a guard rail into the creek below. Plaintiff charged negligence in permitting ridgey accumulations of ice on the approach to the bridge formed by drippings from a cliff at the side, a condition of long standing, which was well known to the defendant, and in maintaining an insufficient and rotten guard rail at the bridge. A judgment was entered on the verdict for the plaintiff, which judgment was sustained on appeal.

It would thus seem that courts have recognized that an icy condition on a public highway, which arises from some reason other than a natural generalized condition, presents the type of hazard with which public authorities should concern themselves, and which can, under certain circumstances, afford the basis for legal responsibility, unless alleviated or guarded against.

Respondent contends that the sign itself, the existence of which was known to claimant, was sufficient warning of the condition, and cites in its brief as authority the case of *Shenk* vs. *Scandrett,* 314 Ill. App. 582. That case involved a suit to recover for the wrongful death of plaintiff's intestate for alleged negligence on the part of defendant, who had constructed and maintained the bridge. The surface of the bridge consisted of planks, which, when wet, were notoriously slippery. Approaching the viaduct from the south was a slow sign 1177 feet south of the bridge. There was a narrow pavement sign 894 feet south of the bridge. The concrete pavement began to narrow 695 feet south of the bridge from 40 feet at that point to 20 feet at the point where the concrete joined the bridge. There was a "Slippery When Wet" sign at the foot of the approach to the bridge. The evidence established that it had rained the night before, which made the planks thor-

oughly wet and very slippery, and, when the accident occurred, it was still drizzling. The automobile of plaintiff's intestate came upon the wet wooden planking, and skidded through the guard rail to the railroad track below. The plaintiffs argued that the condition, which existed on the approach to the viaduct, was extremely dangerous and hazardous, and was one that a motorist would not ordinarily expect, and that similar conditions are not to be found in that vicinity. The court denied recovery stating that "The sign at the bottom of the south approach to the bottom of the viaduct reading 'Slippery When Wet' was erected and maintained by defendant, and constituted a warning to all persons approaching the bridge that they must exercise care in driving upon it when wet." The court in citing from another case, and adopting the reasoning therein as conclusive in that case, stated: "The substance of plaintiff's evidence is that the roadway was slippery, because it was wet. Plaintiff does not claim the surface was slippery, because it was oily, that is, the alleged dangerous defect is that the bridge floor was wet." And, "The evidence discloses no defect in the construction or maintenance of the roadway, and on this record we are compelled to hold that defendant performed its duty to keep the bridge in a reasonably safe condition for travel."

The distinguishing feature in that case from the instant one is that the sign "Slippery When Wet" gave warning of the precise danger or hazardous condition, which existed at the time of the accident, and caused it. In the instant case, it was not the wetness that caused the accident, but a condition not warned of, namely, that the bridge was icy, when there was no reason to believe it would be icy from the surrounding facts and circumstances.

In *LeBoeuf* vs. *State*, 7 N.Y.S. (2d) 621, 1938, in a suit for the death of a person injured in an automobile collision, in which recovery was allowed against the State of New York, the evidence established that the conditions of the roadway at the scene of the accident were such as to cause an eastbound motorist, after leaving the straight, level, concrete approach, and passing over the crest of a hill, to almost immediately descend on a declining grade, and, at the same time, to make a sharp curve to the south or right along a banked macadam surface, whose southerly edge was more than one foot, three inches lower than its northerly edge. The macadam construction became very slippery when wet, and, coupled with the noted physical conditions, created a very dangerous situation. The danger was aggravated by the state's failure to erect warning signs to give eastbound travelers fair notice of the situation ahead, namely, that the concrete pavement ended, changed to macadam, and was slippery and dangerous, because of a sharp curve and descent immediately over the crest of the hill. There was a "Slow" sign 124 feet west of the end of the concrete pavement. Claimant contended, no eye witnesses existing, that the LeBoeuf car, then proceeding in an easterly direction, had skidded, turned around, and hit the bank at the side of the road, causing a window to break, which cut the deceased's jugular vein, and resulted in her bleeding to death. The court in allowing the claim said:

" 'While ordinarily the state would not be liable for conditions due solely to weather, yet when the highway is rendered more dangerous by action of the elements, and the state fails to properly remedy such dangerous condition, it may become liable to one injured thereby. . . . In view of the existing conditions at or near the crest of the hill on the highway in question, *the failure of the state to give adequate warning by the erection of proper and adequate*

*signs at a reasonable distance from the point of danger, constitutes a serious breach of duty, and created an unnecessary dangerous condition.' "*

It is to be noted that this recovery was allowed, even though there was a sign reading ''Slow''. Obviously, from the decision, said sign was held not to be a sufficient warning. It does not appear that it would be sufficient to warn of the particular danger ahead, which was, namely, the sharp curve and slippery pavement. Similarly, the sign in the instant case does not, in our judgment, constitute reasonable and sufficient warning of the particular hazard involved.

In *East Coast Freight Lines* vs. *Baltimore, Maryland, Court of Appeals*, 58 A. (2d) 290, decided April 1, 1948, also reported in 2 A.L.R. (2d) 386, the court ably summarizes the rule, which we believe should apply in this case:

"This court pointed out in that case that it is the duty of the municipality to exercise reasonable care to keep its public highways safe for public travel. It is well settled that it is not an insurer of the safety of persons in the lawful use of such highways, but is only liable for a failure to use reasonable care to so maintain them that travelers thereon in the exercise of reasonable care at night or in the day may not be subjected to any dangers arising from defects in the construction, upkeep, or maintenance of such highways under reasonably foreseeable conditions of weather or traffic. The municipality may, therefore, be liable for injuries caused by an obstruction in a public highway of which it had sufficient notice, even though the obstruction is authorized by proper municipal and legislative authorities, where it is reasonably foreseeable that it will endanger persons using the highway while in the exercise of reasonable care unless it takes the precaution of warning such persons of the danger by some reasonably adequate means. 'Such a liability does not arise from any failure of a general duty to light the highways, but from a failure to exercise reasonable care to guard the traveling public against some special condition of which the municipality had sufficient notice which an ordinarily prudent person might reasonably anticipate would endanger travelers on the highway while in the exercise of reasonable care. 29 C.J. 688. The basis of that liability is the duty resting upon the municipality of keeping the highways safe for travel over them. That duty is not discharged if the highways are permitted to be or remain in such a condition that persons in the lawful use of them may be imperiled by unknown dangers,

which they could not by the exercise of reasonable and ordinary care anticipate or avoid.' "

As appears from the record in this case, Mr. Ferguson, the District Engineer, while within one half mile of the bridge thirty minutes prior to the Bovey accident, knew that the bridge was in the hazardous condition, which had so long concerned the Division of Highways, and also knew that two accidents had already occurred that morning. Had a proper warning system been provided for, he could have easily placed it in operation himself. We do not intend to state the precise type of warning system, which would have been sufficient to have discharged the duty of respondent to give warning of this particular hazard, but it seems to us that a reasonable exercise of care for the particular hazard involved would have been met by proper inspection during the winter months, coupled with the installation of a covered sign, which, when uncovered, would advise the traveling public that the bridge was then icy and hazardous.

It is our considered judgment, from the facts, circumstances, and the above authorities, that negligence of respondent has been established in this case. In finding negligence, however, and, as we stated before, we are basing our decision upon the fact situation presented herein with respect to this particular bridge and hazardous condition, coupled with the ample notice of same to respondent. We do not, by this holding, mean to imply that the state owes an obligation to post a warning sign at every bridge in the state, nor do we mean to imply that the state owes a duty to keep all of its highways and bridges free from ice.

Respondent also contends that claimant was guilty of negligence, which contributed to cause the accident

in question. Respondent contends that claimant knew the adverse conditions of the weather, and was thoroughly familiar with the premises where the accident occurred, having crossed the bridge on many occasions, and living in the vicinity; that the claimant knew of the signs cautioning that the bridge was slippery when wet, and that she also observed the other vehicles stalled upon the bridge, when approaching one hundred yards from the bridge; that there were no hidden conditions or defects of which she was not advised; and that she failed to prove by a preponderance of the evidence that she was in the exercise of due care and caution for her own safety from the time she entered the bridge until the accident occurred.

It is fundamental that the law, as respondent contends, requires claimant to allege and prove that she was in the exercise of due care and caution before a recovery can be granted. In determining this question, many of the same facts and circumstances heretofore discussed in deciding the question of negligence are pertinent.

The only evidence offered in the case concerning the speed at which Mrs. Bovey was proceeding was her own testimony. She stated that she had slowed her automobile to 25 miles per hour before entering the bridge, due to her knowledge that the bridge floor had the tendency of causing the swaying motion, heretofore referred to. She testified she knew of the signs, and also knew that it was misting, and the pavement was damp. She stated that, when she left her mother's home, she went directly to the bridge, a distance of approximately four miles, and at no time did she observe any frost, snow or ice either on the roadway or the surrounding countryside. She testified that the only difference in

the condition of the weather from her first crossing of the bridge was that it was misting, and the roadway was damp. Mrs. Bovey testified that she noticed no drop in temperature from the time she left her home in Grand Detour until the accident occurred. She stated it appeared to her to be unusually warm for that time of the year, and that during the visit with her mother she at no time learned the temperature from either a thermometer or radio announcement.

She further testified that she crossed one concrete surface bridge after leaving her mother's home, and that, although the surface was damp, there was no evidence of slipperiness or icy condition on the bridge.

She states that she did not know the bridge was icy, nor had she any knowledge of the tendency of the bridge to freeze quickly. She had never made complaints to the State of Illinois in regard to the condition of the bridge, and the only complaints she had heard of were the ones concerning the tendency of the bridge floor to cause automobiles to sway, both in dry and wet weather. She stated that she had never crossed the bridge at a time when it was icy.

With respect to the two automobiles on the bridge at the time she entered, she testified that, as she approached the bridge, she noticed the two cars on the bridge, one of which was on her left about the middle of the bridge, and the other was to her right at the far end of the bridge. She testified that she did not know whether both cars were moving or stopped. She testified that there was nothing to indicate to her that an accident had happened, and no people were visible around the automobiles. She testified that, upon entering the bridge, her car immediately swerved to her right, throwing her front wheels against the curb, and that

she lost control of the automobile; that she tried to regain control, but was unable to do so; that she at no time applied the brakes; and that her automobile remained out of control, until it collided with the Zander automobile.

From the testimony of claimant, and from all of the surrounding facts and circumstances, we cannot say that there is any evidence of contributory negligence on her part, and it is our further judgment that she has maintained the burden of proof in establishing that she was in the exercise of due care and caution at the time of, and immediately prior to the accident in question.

It is true, as respondent contends, that the user of a highway is under a duty to exercise care commensurate with the conditions known to exist. *Briske* vs. *Village of Burnham,* 379 Ill. 193, *Dee* vs. *City of Peru,* 343 Ill. 36; *Duffie, Et Al* vs. *State of Illinois,* 19 C.C.R. 40. On the other hand, it is also the law that a motorist is bound to exercise only that degree of care of an ordinarily prudent person to prevent injury to himself or his property, and is not required to exercise extraordinary care. The test is, was he, at the time of the accident, using such care as a prudent man in such an occupation ordinarily uses, considering the time, place, condition of the highway, the weather, the vehicle used, and the presence of other persons? *Cyclopedia of Automobile Law and Practice,* Blashfield, Vol. 5A, Par. 3312, p. 365. As stated in *Habenstreit* vs. *City of Belleville,* 302 Ill. App. 383 at 386:

"The law does not charge one with anticipating danger and negligent conditions, but he may assume that others have done their duty to give proper warning of hidden dangers. Citing *Pollard* vs. *Broadway Central Hotel Corporation,* 353 Ill. 312."

Due to the lack of visible evidence of the existence of ice, snow, frost, or extremely cold weather, we believe that the danger was a hidden one, at least to members of the traveling public before they entered the bridge, and that claimant should not be held, under the facts and circumstances of this case, to have discovered it in time to avoid the effects of the danger.

It is, therefore, our holding that claimant was in the exercise of ordinary care for her own safety at the time of, and immediately prior to the accident in question.

There can be no serious question but what the dangerous and hazardous condition, under the facts and circumstances of this case, was the proximate cause of the collision in question. There has been no evidence of negligence against the driver of the automobile with which Mrs. Bovey collided, and certainly there could be no reasonable contention that any act on the part of a third person was a sufficient intervening cause.

It is, therefore, our considered judgment that claimants have established a claim against respondent for the damages and injuries resulting from this accident.

With respect to damages, the evidence establishes that claimant, Mrs. Bovey, suffered severe injuries, consisting of shock, lacerations of the face, fracture of the right arm, and a compound fracture of the left femur, said fracture being a transverse fracture above the knee, and a longitudinal fracture extending into the knee joint, which has caused fragmentation of the upper portion of the knee joint.

It appears from the evidence that Mrs. Bovey has satisfactorily recovered from the concussion and the fracture to the right arm. The evidence establishes a scar near the left eye, and another near the chin, which

are relatively small, and not prominent. Dr. Edward S. Murphy of Dixon, Illinois, the treating physician of Mrs. Bovey, testified that claimant has sustained a decided loss of function of the left leg, to-wit: approximately 90% loss of use of flexion of the knee. He testified that this loss of function appears to be permanent, and will not improve. At the time of the hearing, Mrs. Bovey was able to walk without artificial aid, but still had trouble with swelling above the knee, and was still under the doctor's care. The evidence establishes that a metal plate was inserted in the leg, and will be removed in the future. The removal of the plate will not affect the 90% loss of flexion of the knee.

The doctor testified that, because of her stiff leg, she will be able to perform some household duties, but not all duties.

The testimony and exhibits reflect a doctor bill of $1,193.80, and future surgical fees for the removal of the metal plate will approximate $50.00. It was necessary for claimant to be hospitalized for a total of 217 days, during which she incurred numerous items of hospital expense, all totaling $2,548.60. The evidence establishes that $500.00 of the hospital bill has been paid by Robert Bovey's insurance company under the medical payments provisions of the policy.

Obviously the injury to Bettie B. Bovey is serious and permanent. It seems just that a maximum award should be made, which amount is $7,500.00.

In regard to the claim of Robert W. Bovey, we must keep in mind Section 8C of the Court of Claims law, wherein it provides a limitation for damages as follows:

"Provided that an award for damages in a case sounding in tort shall not exceed the sum of $7,500.00 to or for the benefit of any claimant."

Mrs. Bovey has been awarded the maximum sum, and, therefore, any item of expense incurred by Mr. Bovey for her benefit has already, by force of the above limitation, been included in the sum awarded to Mrs. Bovey.

Mr. Bovey testified that, because of his wife's injuries, he purchased three pairs of special shoes to accommodate her leg brace, at about $16.00 a pair, totaling $48.00; two skirts to conceal the braces, totaling $25.00; and expended the sum of $75.00 for sedatives, vitamins and calcium.

We can allow no recovery for these items, since they directly benefited Mrs. Bovey. If such items of expense were allowed, then there would be no reason why the entire medical or hospital bill could not be considered as Mr. Bovey's claim, rather than Mrs. Bovey's.

Another item of expense, claimed by Mr. Bovey, is an amount expended in the employing of women to perform household work, beginning in late August of 1952, at an average of $5.00 per week. The only competent testimony offered in regard to Mrs. Bovey being able to perform her household duties was the doctor, who stated that she would be able to perform some household duties, but not completely. Mrs. Bovey did not testify with regard to her ability, or lack of ability, to perform her household work. In this state of the record, we could only speculate upon what Mrs. Bovey can do, and what she can not do. We do not intend to do this. A mere incurrence of an expense does not constitute proof that it was necessary. In addition thereto, Mrs. Bovey has, as we have stated before, been compensated as fully as this Court has the power to order, and any portion of the housework expenses, incurred for her benefit or

convenience, would not be compensable under Mr. Bovey's claim.

Mr. Bovey testified that it was necessary for him to have his laundry and pressing done commercially during the time that his wife was confined to the hospital, and that it averaged $5.00 per week. He stated that she had done this work for him up until the happening of the accident. This presents a compensable claim, since no part of those services could be considered as benefiting Mrs. Bovey, and would not, therefore, be included within the amount awarded her.

In computing the amount Mr. Bovey should be awarded, we are determining that he should be compensated for this expense up to and including September 1, 1952, which is the date that Mrs. Bovey was apparently able to resume caring for her child. This would entitle him to recover the sum of $200.00, being $5.00 per week for forty weeks. Although Mr. Bovey testified that he is still incurring this expense, there is nothing in the record to establish that his wife is unable to perform such services at this time, and there is nothing in the record with respect to the length of time she was unable to do so. Any extra cost in laundering the clothing of Mrs. Bovey would not be compensable for the reasons heretofore set out.

Mr. Bovey also incurred an indebtedness of $400.00 to his sister-in-law, Mrs. Fred Bovey, who cared for claimants' five year old son at $10.00 per week from November 26, 1951 to September 1, 1952, by reason of his mother, Bettie Bovey, being unable to do so. This is also compensable, since Mr. Bovey would have had to care for the child himself, or provide for his care by others.

It is, therefore, ordered that the claim of Bettie B. Bovey be allowed in the amount of $7,500.00, and that Robert W. Bovey be awarded on his claim, the sum of $600.00.